AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Louisiana

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1) ONE BLACK AND GREEN NVIDIA DESKTOP<br>COMPUTER, TAG NUMBER RC942KKN1111101194  AND<br>(2) ONE SAMSUNG GALAXY S8+, CELLULAR PHONE,<br>IMEI NUMBER 357725083613316 | )<br>)<br>)<br>)<br>)<br>)   Case No.  21-mc-2140 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Eastern_____ District of _____Louisiana_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 245 | Interference with Federally Protected Activities |
| 18 U.S.C. § 875(c) | Threatening Interstate Communications |
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____/s/ James F. McKee_____
*Applicant's  signature*

_____James F. McKee, Special Agent, F.B.I._____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____11/18/21_____

City and state:  New Orleans, Louisiana

Honorable Michael B. North, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE SEARCH OF:
   (1) ONE BLACK AND GREEN NVIDIA
       DESKTOP COMPUTER, TAG
       NUMBER RC942KKN11111201194
       AND
   (2) ONE SAMSUNG GALAXY S8+,
       CELLULAR PHONE, IMEI NUMBER     Case No. 21-mc-2140
       357725083613316,
CURRENTLY LOCATED AT THE
FEDERAL BUREAU OF INVESTIGATION,
2901 LEON C. SIMON DR., NEW
ORLEANS, LOUISIANA

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, James F. McKee, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.    I am a Special Agent with the Federal Bureau of Investigation, and have been since December 2, 2020.  I am assigned to the Cyber Squad located in the New Orleans Field Division.  I am tasked with investigating various types of federal cybercrime including, but not limited to, computer intrusions, internet fraud, and national security matters.

3.    The information in this affidavit is based on my personal knowledge, voluntary interviews with witnesses, information provided by other law enforcement officers, individuals,

and the reports and memoranda of other law enforcement officers. The information in this affidavit is provided for the limited purpose of establishing probable cause in connection with an application for a search warrant. The information is not a complete statement of all the facts relating to this investigation.

4.      This is an investigation into possible violations of federal law, including 18 U.S.C. § 245 (Interference with Federally Protected Activities); 18 U.S.C.§ 875(c) (Making Interstate Communications with a Threat to Injure), and 18 U.S.C. § 1343 (wire fraud); arising from threats of violence made against teachers and students of Laureate Academy Charter School (LACS) during an online class held via a video conferencing platform called Zoom, as well as the theft of Best Buy rewards points to illegally obtain a computer.

5.      As described in more detail below, based on the federal investigation thus far, I believe that the subject of the investigation, Brian Adams ("Adams") using aliases including the Zoom user name "alex jones" and YouTube display name of "Arch angel gaming," gained unauthorized access into an online school fifth-grade class and used racial epithets and threats of violence to intimidate the students and teachers participating in the class, resulting in LACS shutting down online classes for over two days.

6.      Additionally, as described in more detail below, I believe that Adams obtained access information for another person, M.V.'s email account, and accessed that account without M.V.'s permission.  Furthermore, I believe that Adams discovered M.V.'s Best Buy rewards points account, and utilized that rewards account to purchase computer components.

7.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.    The property to be searched is:

a.   One NVIDIA desktop computer, tag number RC942KKN11111201194 (the "Target Computer"); and

b.   One Samsung Galaxy S8+ cellular phone, IMEI number 357725083613316 (the "Target Cellphone").

I refer to the Target Computer and the Target Cellphone collectively as the "Devices."  The Devices are currently located at the Federal Bureau of Investigation, 2901 Leon C. Simon Dr., New Orleans, Louisiana.

9.    The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## RELEVANT STATUTES

10.    Title 18, United States Code, Section 245(b)(2), Federally Protected Activities, provides in pertinent part that it is unlawful for any person "by force or threat of force [to] willfully . . . intimidate[] or interfere[] with, or [to] attempt[] to . . . intimidate or interfere with" another person "because of his race, color, religion or national origin" and because he is or has been participating in one or more enumerated protected activities (here, students attending, benefitting from, and participating in classes at LACS and teachers being employed by LACS). An essential element of a Section 245(b)(2) violation is that the defendant was motivated to commit the crime because of one of the enumerated protected characteristics (i.e., race, color, religion, or national origin).

11.      Title 18, United States Code, Section 875(c) provides in relevant part that it is unlawful for any person to "transmit[] in interstate or foreign commerce any communication containing . . . any threat to injure the person of another."

## PROBABLE CAUSE

### I.  Background

12.      The FBI is investigating an incident that took place on or about October 14, 2020, involving possible violations of 18 U.S.C. § 245 (Federally Protected Activities) and 18 U.S.C. § 875(c) (Interstate Communications), among other statutes, in which an unknown subject used racial slurs and threats of violence against teachers and fifth-grade students of LACS during an online Zoom class.

### a.  Zoom

13.      Zoom is a U.S.-based communications technology company that provides videoconferencing and online chat services through a cloud-based peer-to-peer software platform.  A user is not required to create an account with Zoom in order to participate in a particular videoconference meeting.  However, if a user signs up for a free or paid Zoom account, the user must supply his email address.  After a user supplies his email address, he will typically receive a confirmation email from Zoom containing a link the user must click to activate the Zoom account.

14.      Each Zoom meeting has a host who is responsible for administering the meeting via the platform's controls.  Zoom users can invite others to an online meeting "room," which is an online location where each user can see and interact with the other users.  Each meeting room is associated with a Zoom meeting ID number.  Zoom hosts have the ability to require participants to wait in a "waiting room" before they are admitted to the meeting room and may

refuse to admit participants in the waiting room.  Hosts can also eject participants from the meeting, mute participants, and prevent or allow participants to share their computer screens with the rest of the participants.  Zoom hosts also have the ability to transfer hosting duties to other users.

15.    To log in to a particular Zoom videoconference, a participant (whether registered with Zoom or not) enters a unique 9-, 10-, or 11-digit Meeting ID number, or accesses the room directly from a link provided by the meeting host.  The participant must also enter a username that he or she wants to use for that meeting.  The participant's username for a specific meeting does not have to be the same as the participant's account username or email address.  During a meeting, participants can show a live video of themselves to others through the webcam feature, but participants are not required to use the webcam feature in order to participate in the meeting.

16.    The term "Zoombombing," also known as "Zoom Bust" or "Zoomraiding," refers to an individual, often using an alias, attending a Zoom meeting uninvited and distracting the meeting with offensive or disturbing audio and/or video content.

**b.  Laureate Academy Charter School (LACS)**

17.    LACS is a publicly-funded K-8 charter school, located in Harvey, Louisiana.  On the date of the incident, the school was following quarantine protocols as a result of the ongoing COVID-19 pandemic and holding virtual online classes on Zoom for most of its students.

18.    According to A.T., an LACS administrator, LACS students have access to a Google classroom dashboard, and students receive links to their respective virtual Zoom classrooms through their LACS Google email, Google calendars, and Google classroom accounts.  A.T. stated that students typically access the virtual classroom via the Zoom link for that class.

5

**II. Zoombombing Incidents Involving Adams**

19.     On the morning of October 14, 2020, T.F., one of the teachers at LACS, and an
assistant teacher, R.M., began to teach a fifth-grade class with a majority of African-American
students.  T.F. informed the FBI that she noticed several individuals with suspicious usernames
(such as "Bryan Adams" and "Nick Gur," the latter of which sounds like a racial slur) attempting
to enter the classroom, but she was able to remove those individuals from the class.  At
approximately 10 a.m., T.F. heard a male's voice say words to the effect of "Look at you fucking
niggers," and saw that the speaker was using the Zoom username of "alex jones."  T.F. ejected
"alex jones" from the classroom and sent the students a Zoom link to a new virtual classroom.
The students were required to leave the old virtual classroom and enter the new classroom.

20.     About thirty minutes later, "alex jones" entered the new virtual classroom and, as
described in greater detail below, used racial epithets and threats of violence against the teachers
and students of the class.  Given the proximity in time, the fact that the same class was targeted,
and the fact that the Zoombomber in both incidents used the same username, I believe that the
same individual disrupted the classroom on both occasions on October 14, 2020.  Based on my
understanding from LACS that Zoom classroom meeting information is not publicly available,
"alex jones" must have received the new Zoom link shortly after it had been sent to the students'
Google accounts.  As described in more detail below, I believe that the person utilizing the
username "alex jones" was Adams.

21.     On or about October 15, 2020, two LACS students notified LACS teachers and
administrators of the existence of a YouTube video titled "zoom busted" that documented the
Zoombombing incident that had occurred the day before.  The video had been uploaded to the

YouTube    Channel    "Arch    angel    gaming"    located    at    the    website: https://www.youtube.com/channel/UCehsYic7Etph5W5NcaE7XQw.

22.      Between October 14 and October 21, 2020, the video could be found at the website:  https://www.youtube.com/watch?v=4fvZz9T2Iww.   The video was taken down by Google on or about October 21, 2020, for violating YouTube's policy concerning hate speech.

23.      Based on my review of the recording, I believe that the individual who created the video participated in the Zoom class on a computer and used software to record his computer screen.  The recording lasts approximately 2 minutes, 21 seconds, and includes video and audio. Based on the facts outlined below, I believe that the user who created the video is the same person who entered the LACS virtual class using the name "alex jones," specifically, Adams. The following describes what happens in the video:

24.      At the start of the recording, Adams's computer screen is filled by a web browser showing the Zoom online class of one of the fifth-grade classes of LACS.  In the video, the Zoom class is in "gallery" view, which allows twenty-five participants to be viewed on the screen at the same time.  At least two adults (T.F. and R.M.) and twenty-two students from LACS, as well as one unknown meeting participant identified as "alex jones," are participating in the meeting session.

25.      Most of the students have their video cameras on, and their faces are visible. One of the teachers and more than half of the visible students in the virtual classroom are Black. Adams has not turned on his camera, so his image cannot be seen in the Zoom meeting.  Instead, Adams is represented by a black box with the letter "a" in large print and "alex jones" in smaller print.  Whenever Adams speaks, his Zoom window becomes highlighted.

7

26.     When the video begins, the class is in session, and one of the teachers is speaking to the students.  Adams disrupts the class by using racial epithets, profanity, and threats of force and violence.  He first yells, "You all are a bunch of dirty niggers" and "I am gonna hang you by the tree you dirty nigger."  He continues making threats, saying, "I am gonna hang you by the tree dirty nigger, I am gonna hang you by the tree."  Students and teachers visibly react to Adams. Multiple students cover their eyes or ears.  At least one student appears to start crying. The assistant teacher, R.M., tells the class that she has muted the participants in the Zoom classroom; Adams's screen indicates that he has been muted.

27.     After R.M. mutes the participants in the virtual classroom, Adams switches to a different browser on his computer and begins to search for the term "swastika" in the web browser:



28.     Adams then searches the Google search engine for swastika images. A small black and white icon associated with his Google account profile depicts a white male.

8



29.    Based on my training and experience, the presence of the profile picture in the Google browser of Adams's screen indicates that Adams was logged into his Google account as he searched for swastika images and as he threatened the LACS class with racial violence.

30.    When the results of the search appear, Adams selects one of the swastika images and then selects a suggested "related image" of a different swastika. Based on my training and experience and my review of the video, I believe that Adams then right clicks his mouse on the image, producing a drop-down menu, and selects "Search Google for image."



31.    Images of Nazi flags with swastikas appear on the screen, and Adams appears to conduct an additional search on Google for Nazi flags.

9

32.     While the YouTube video shows Adams searching for images of swastikas and Nazi flags, the audio from the LACS Zoom class can still be heard.  A female, who sounds like an adult, states that she is "extremely uncomfortable."

33.     Adams immediately pulls up the web browser with the Zoom meeting and uses his cursor to unmute his microphone in the Zoom meeting.  As soon as Adams unmutes his microphone, a male voice states "Who cares if you are uncomfortable, nigger" and the Zoom window for "alex jones" becomes highlighted.  This sequence of events indicates that Adams, the computer user who made the recording and searched for swastika and Nazi flag images, is the same person as the Zoom user identified as "alex jones."

34.     After Adams uses more profanity, one of the Zoom meeting hosts removes Adams from the meeting, and Adams stops the recording.

35.     Because of this Zoombombing incident, as well as other attempts by one or more uninvited individuals using suspicious names/aliases to enter other Zoom meetings hosted by LACS on October 14 and 15, 2020, LACS cancelled the remainder of the online classes on each of those days, as well as all classes on October 16, 2020.

36.     Based on the records produced by Zoom, I believe that Adams entered an LACS online Zoom class hosted by T.F. (the same teacher who hosted the October 14, 2020, class) on October 20, 2020, using the same alias of "alex jones," and that he was ejected from the class.

### III. Identifying "alex jones" as Brian Adams

#### a.  Email account associated with "imajew41@gmail.com"

37.     On or about January 26, 2021, the FBI received subpoena returns from Zoom, Inc., for records related to the account "business@laureatecharter.org," which is the Zoom account used by LACS for online classes and meetings.  The returns included data associated

with the October 14, 2020, incident during which "alex jones" threatened the students and teachers of LACS with racial violence.

38.     The Zoom records indicate that the individual associated with the username "alex jones" provided Zoom with "imajew41@gmail.com" as his email address.

39.     Based on my training and experience, and these Zoom records, I believe that "alex jones" set up a Zoom account using "imajew41@gmail.com" as his email address; that Zoom likely sent him an email with a link to confirm that this Gmail account was his; and that he likely confirmed, by clicking on the link, that the email account "imajew41@gmail.com" was his account.

### b.   "Arch angel gaming YouTube Channel"

40.     Based on the investigation to date, I believe that the account holder for "Arch angel gaming" YouTube Channel is responsible for, or an associate of the person responsible for, threatening the LACS classroom on October 14, 2020.

41.     On or about October 16, 2020, the YouTube channel for "Arch angel gaming" contained the following profile picture:



42.     This "Arch angel gaming" profile picture appears to be the same as the Google profile picture in the YouTube video of the Zoombombing incident discussed above, that appeared when Adams searched Google for swastika images.  Based on my training and experience, I know that each Google account includes access to YouTube, and a user must have an existing Google account in order to sign into YouTube.  Because the profile pictures appear identical, I believe that the individual who used the username "alex jones" during the

Zoombombing incident (and who used "imajew41@gmail.com" as his Zoom account email address) and the YouTube account holder of "Arch angel gaming" are likely the same individual.

43.     In addition, the Zoombombing video was uploaded onto the YouTube Channel "Arch angel gaming" less than 24 hours after the October 14 incident occurred.  That "Arch angel gaming" had access to and uploaded the video so quickly after Adams made the video may indicate that the YouTube account holder was personally involved in the production of the video.

### c.  Email account associated with "www.farcry3@gmail.com"

44.     On or about February 12, 2021, a search warrant for Google was signed by U.S. Magistrate Judge Michael B. North of the Eastern District of Louisiana for the Google accounts associated with imajew41@gmail.com and the "Arch angel gaming" YouTube Channel.  A response from Google was received on or around March 18, 2021, and additional information was received on April 14, 2021.  Based on the records received, investigators learned that www.farcry3@gmail.com was the Google account used to register for the "Arch angel gaming" YouTube Channel.

45.     Google's response to the search warrant also provided several connections between imajew41@gmail.com and www.farcry3@gmail.com that further suggested both accounts were controlled by the same individual at the time of the LACS Zoombombing incident in October 2020.

   a.  Imajew41@gmail.com and www.farcry3@gmail.com were accounts linked by cookies.[1]  This indicates that both accounts were accessed from the same web browser and likely controlled by the same user.

---

[1] Cookies are textual information generated by webservers to save settings and facilitate web browsing.  When a user logs into a Gmail account, various pieces of information, such as identifiers for the computer, logged-in user,

     b.   Between September 30, 2020, and October 25, 2020, imajew41@gmail.com and www.farcry3@gmail.com each had a login IP address 207.174.148.230. The LACS online classroom session that occurred on October 14, 2020 as referenced in Paragraph 19, also had unidentified meeting logins from IP address 207.174.148.230 that were assessed to be the same individual as "alex jones."

     c.   Based on the use of the same IP address and the fact that the two e-mail accounts were linked by cookies, I believe that the same individual operates both imajew41@gmail.com and www.farcry3@gmail.com.

46.    More significantly, both imajew41@gmail.com and www.farcry3@gmail.com contained identifying information for an individual named Brian Adams.

     a.   Imajew41@gmail.com was used to register for an online account at playerauctions.com and received three purchase confirmation notifications addressed to Brian Adams.

     b.   Both accounts listed March 9, 2000, as the user's date of birth. Kentucky driver's license records for an individual named "Brian Adams" also had a date of birth of March 9, 2000.

     c.   On or about September 18, 2020, imajew41@gmail.com received a notification from Cash App confirming a payment had been sent by Brian Adams.

---

and browser, are sent to Google. In turn, Google generates various unique cookies for the user based on the information received. If the user logs into another Gmail account using the same browser without explicitly deleting these cookies, some of the same cookies will be sent back to Google. Google logs which accounts are accessed using each unique cookie, thereby linking the accounts together as being accessed from the same browser.

d.  On or about November 7, 2020, imajew41@gmail.com received three confirmation e-mails from playerauctions.com addressed to Brian Adams.[2]

e.  Www.farcry3@gmail.com contained two video recordings that featured "selfie" videos of the user.  The person in the "selfie" videos strongly resembled the individual pictured in the Kentucky driver's license photograph of Brian Adams.



f.  The www.farcry3@gmail.com listed the e-mail addresses adams.brian@ridgemont.k12.oh.us; brian.adams@stu.paintsville.kyscools.us; and jeffbadams760@gmail.com as contacts.

g.  On or about October 30, 2020, www.farcry3@gmail.com received an e-mail from support@denpasoft.com addressed to brian.adams regarding a password reset.

---

[2] The imajew41@gmail.com also received at least two e-mails addressed to "Tyrone."  Based on review of the www.farcry3@gmail.com account, the account holder appears to have been familiar with a character from the comedy series *The Chappelle Show* known as Tyrone Biggums.  I believe he may have used that first name to register for some accounts as a reference to that character.

h.  On or about January 15, 2021, www.farcry3@gmail.com sent an e-mail to support@chime.com with personal identifiable information.  The e-mail included a screenshot of a Kentucky ID for Brian Stacey Adams.



i.  The www.farcry3@gmail.com account contained a video dated April 14, 2021, in which the user plays the computer game "Clash of Clans."  As depicted in the screen capture below, the user is visible in the video and physically resembles the picture of Brian Adams from the Kentucky ID.  I have reviewed the video and the user's voice is similar to the voice heard in the LACS zoom bombing video.



j.   Based on the above information, I believe the individual known as "Alex Jones" is in fact Brian Stacey Adams of Paintsville, Kentucky.

**d.   Identification of Registration Address for Adams's IP Address**

47.   Through open source research, the FBI identified Foothills Communication as the internet services provider for Adams's IP address, 207.174.148.230.   On February 9, 2021, the FBI served a grand jury subpoena on Foothills Communication for information related to IP address 207.174.148.230.   Returns from Foothill Communications indicated that the subscriber associated with the IP address was Jeff Adams, 1010 Pineview Lane Lot 4, Paintsville, Kentucky 41240.

48.   On or about September 20, 2021, the FBI served an additional grand jury subpoena on Foothills Communication regarding the address 1010 Pineview Lane Lot 4.

Returns provided by Foothills Communication continued to indicate that the subscriber associated with the address was Jeff Adams.

49.     This address matches the address identified in search warrant returns associated with the www.farcry3@gmail.com e-mail address.  For instance, on or about September 16, 2020,        www.farcry3@gmail.com        received        a        confirmation        e-mail        from bankmobile@bankmobilewebemail.com addressed to Brian Adams, confirming an address change to 1010 pineview LN LOT 4, Paintsville, KY 41240.

50.     Additionally, on or about November 8, 2020, www.farcry3@gmail.com sent an e-mail to kyc@bitskins.com providing a full name of Brian Adams and a current address of 1010 Pineview Ln Lot 4.

51.     Based on open source research, Jeffrey B. Adams is an approximately 45-year old white male who lives in Paintsville, Kentucky.  I believe Jeffrey B. Adams is likely the father of Brian Stacy Adams, and that Brian Adams lives with his father and uses his internet service.[3]

52.     On or about October 26, 2021, law enforcement officers conducted surveillance in the vicinity of 1010 Pineview Lane, Lot 4, Paintsville, Kentucky 41240.  Officers confirmed a mobile/trailer home was stationed at the address.  A black Chevrolet Cruze bearing Kentucky license plate number 550-YSP was observed parked in front of the residence.  Database searches indicated the vehicle was registered to Jeffrey B. Adams.

---

[3] The Kentucky Driver's License for Jeffrey B. Adams lists his address as 1012 Pineview, not 1010 Pineview.  All the known utilities registered to Jeffrey B. Adams, including internet and cell service, are registered to 1010 Pineview.  The Driver's License card is the only reference to 1012 Pineview I am aware of.  Based on the multiple registrations and references to 1010 Pineview, I believe 1012 Pineview may be an outdated address or may refer to a central building location in the subject's residential division.

53.     Additionally, law enforcement officers approached the residence and made direct contact with the residents.  Two male residents identified themselves as Brian Adams and Jeffrey Adams.  The two residents' physical appearances matched those depicted in investigative photographs associated with Brian Adams and Jeffrey Adams.

**IV. Execution of Search Warrant at 1010 Pineview Lane, Lot 4, Paintsville, KY**

54.     On November 2, 2021, the FBI obtained a search warrant for Adams's residence at 1010 Pineview Lane, Lot 4, Paintsville, KY 41240 (the "Premises").  *See* 7:21-MJ-23-EBA (E.D. Ky. Nov. 2, 2021).   The warrant authorized the FBI to search the Premises and seize relevant electronic devices.

55.     On November 3, 2021, the FBI executed the aforementioned search warrant on the Premises.  During the search, FBI agents interviewed Adams after he received *Miranda* warnings.  Adams told FBI agents that in or around October of 2020, he participated in a Zoom bombing of a school's virtual classroom.  He believed the school was located in New Orleans, Louisiana.  Adams also told agents that he recalled using racial slurs and making threats against the students in the virtual classroom.  Adams stated he then uploaded a video recording of the Zoom bombing incident to his YouTube account, which he confirmed was named Arch angel gaming.  Based on all the evidence collected to date and Adams's statement to the FBI, I believe Adams was the individual who committed the Zoom bombing incident against the Laureate Academy Charter School in New Orleans, Louisiana.

56.     Adams stated that he used his personal desktop computer to commit the Zoom bombing.  Although the precise desktop case he used had since changed, Adams stated that the hard drive originally in his computer at the time of the Zoom bombing had been migrated into

his new desktop.  Agents seized Adams's desktop computer, the "Target Computer," as part of executing the warrant inside the Premises.

57.     Additionally, Adams told agents that he also used his cellular phone to view content on YouTube.  Based on prior review of search warrant returns from Google, Adams had viewed YouTube videos of the Zoom bombing he committed, as well as multiple other videos that depicted individuals using racial slurs, such as the n-word.  Agents seized the Target Cellphone, as part of executing the warrant.

58.     In addition to confessing to the Zoom bombing at Laureate Academy Charter School, Adams also told agents that he had obtained over $1000 worth of computer equipment by using Best Buy rewards points he had stolen from an unknown victim's e-mail account. Adams stated that he had obtained login credentials to a Yahoo e-mail account from a forum on the social media platform Discord.  He then logged into the e-mail account and identified correspondence including the victim's Best Buy rewards points number.  Adams stated that at least some of the components inside the Target Computer seized by agents during the search warrant had been purchased using the stolen points.[4]

59.     On or about November 8, 2021, the FBI contacted Best Buy regarding the potential fraud.  Best Buy indicated that in late August, 2021, shipments of approximately $1230 dollars in computer equipment had been purchased by an individual named "jack jones."  That

---

[4] During the interview, Adams stated that approximately one year prior, Adams reinstalled the Windows operating system on the computer he utilized during the Zoom bombing incident, which erased the contents of the hard drive. That hard drive was made a part of the Target Computer along with computer parts obtained through the stolen Best Buy rewards points.  Assuming that data at the time of the Zoom bombing incident may have been deleted, I believe it may be possibly to forensically restore some of the data erased as part of the reinstallation.  Additionally, I believe it is likely that other data relevant to the Zoom bombing incident may have been migrated to the hard drive after the Windows reinstallation.

individual provided a shipping address of 1010 Pineview Lane, Lot 4, Paintsville, KY 41240, which is the address of the Premises.  The user named "jack jones" used Best Buy rewards points belonging to a Best Buy customer with the initials M.V., a Pennsylvania resident, to make the purchase.  The FBI interviewed M.V., who confirmed that Best Buy had informed her of a potential fraudulent use of her Best Buy points.  Based on Adams's statement, M.V.'s statement, and the records provided by Best Buy, I believe "Jack Jones" was in fact Adams, and that Adams used M.V.'s Best Buy rewards points to purchase a substantial portion of the components inside the computer that was seized from his residence.[5]

60.     Based on the above, there is probable cause to search Adams's computer and cell phone, both of which were seized during the execution of a lawful search warrant, for evidence of the Zoom bombing intrusion and the purchase of computer components with stolen Best Buy rewards points.

61.     The Devices are currently in the lawful possession of the FBI.  They came into the FBI's possession in the following way:  the Devices were seized by the FBI during execution of the aforementioned search warrant at the Premises, and were subsequently transported to the FBI's New Orleans Field Division.  Additionally, during the interview, Adams provided the FBI with written and verbal consent to search the Devices.  Therefore, while the FBI might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

---

[5] When interviewed, Adams could not remember the name of the individual whose Best Buy points he had used, but believed it may have been "Corey."  Given Adams's uncertainty and the consistency of the remaining evidence, I believe M.V. was Adams's true victim.

62.     The Devices are currently in storage at the FBI's New Orleans Field Division, 2901 Leon C. Simon Dr., New Orleans, Louisiana.  In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## TECHNICAL TERMS

63.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.   The Global Positioning System (generally abbreviated

22

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet

23

through cellular networks, 802.11 "wi-fi" networks, or otherwise.   Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.   Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   Pager:   A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.   Some pagers enable the user to send, as well as receive, text messages.

h.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24

64.    Based on my training, experience, and research, I know that the Target Cellphone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

65.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

66.    There is probable cause to believe that things that were once stored on the Target Computer may still be stored there, for at least the following reasons:

   a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

67.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers,

26

e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.    I know that when an individual uses an electronic device to obtain unauthorized access to a victim electronic device or account over the Internet, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

68.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

69.    *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

70.    I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described

in Attachment B.

Respectfully submitted,

/s/James F. McKee
James F. McKee
Special Agent
Federal Bureau of Investigation


Pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3), the undersigned
judicial officer has on this date considered the information communicated by reliable electronic
means in considering whether a complaint, warrant, or summons will issue. In doing so, I have
placed the affiant under oath, and the affiant has confirmed that the signatures on the complaint,
warrant, or summons and affidavit are those of the affiant, that the document received by me is a
correct and complete copy of the document submitted by the affiant, and that the information
contained in the complaint, warrant, or summons and affidavit is true and correct to the best of
the affiant's knowledge.

Subscribed and sworn to before me on
this 18th day of November, 2021,
New Orleans, Louisiana.

_____
HONORABLE MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

29

## ATTACHMENT A

The property to be searched is:

    a.  One NVIDIA desktop computer, tag number RC942KKN11111201194 (the "Target Computer"); and

    b.  One Samsung Galaxy S8+ cellular phone, IMEI number 357725083613316 (the "Target Cellphone").

I refer to the Target Computer and the Target Cellphone collectively as the "Devices." The Devices are currently located at the Federal Bureau of Investigation, 2901 Leon C. Simon Dr., New Orleans, Louisiana.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of

18 U.S.C.§ 875(c) (Making Interstate Communications with a Threat to Injure), and 18 U.S.C.

§ 1343 (wire fraud) and involve Brian Stacey Adams since October 1, 2020, including:

      a.  The occupation and/or ownership of 1010 Pineview Lane Lot 4, Paintsville, KY

          41240;

      b.  IP address 207.174.148.230;

      c.  MAC address 1C1B0D66E7F1;

      d.  The Laureate Academy Charter School;

      e.  Zoom bombing, including but not limited to information related to recording and

          posting Zoom bombing videos;

      f.  Zoom meeting log ons;

      g.  Racist imagery and terminology, including but not limited to the use of the N-

          word, lynchings, and swastikas;

      h.  The YouTube channel "Arch angel gaming";

      i.  The e-mail accounts www.farcry3@gmail.com and imajew41@gmail.com;

      j.  The identity of the person(s) who accessed the LACS Zoom call on or about

          October 14, 2020, including records that help reveal the whereabouts of such

          person(s);

      k.  Any communication with co-conspirators or victims related to the LACS

          Zoombombing incident;

      l.  Orders of computers or computer components from Best Buy;

      m.  Discord forums involving discussion of email or other account login credentials;

      n.  Best Buy rewards points; and

      o.  Email and other accounts associated with M.V.;

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of the Internet Protocol address 207.174.148.230 to communicate with servers operated by Zoom, including:

      a.  records of Internet Protocol addresses used;

      b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2